IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARBARA LYONS, et al.,     )
            )
    Plaintiffs,     )    No. 14 C 6361
            )
    v.     )    Honorable Judge
            )    Maria Valdez
            )
THOMAS J. DART, et al.,     )
            )
    Defendants     )

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
SUMMARY JUDGMENT MOTION AND REPLY IN
SUPPORT OF THEIR SUMMARY JUDGMENT MOTION**

Plaintiffs Barbara Lyons, Gregory Koger and Shakira Carter,[1] through counsel, respectfully submit the following response to Defendant's motion for summary judgment and reply in support of their motion for summary judgment.

## I.    Introduction

This case is a First Amendment challenge to Defendant Sheriff Tom Dart's policy prohibiting inmates at the Cook County Jail (the "Jail") from possessing more than three books and/or magazines at a time, subject to exceptions for religious books, legal materials and schoolbooks. Plaintiffs contend that the Jail's three-book/magazine policy constitutes an arbitrary and unnecessary restriction on inmates' First Amendment rights. Plaintiffs do not seek to allow detainees to possess an unlimited amount of books and/or magazines in their cells. Rather,

---

[1] Plaintiffs have moved for summary judgment in favor of Plaintiffs Koger and Lyons. Plaintiff Shakira Carter does not seek summary judgment in her favor, but she opposes Defendants' motion for summary judgment against her.

Plaintiffs simply contend that the Jail should treat books and magazines the same way it treats writing pads, legal materials, religious books and schoolbooks—items that it has admitted pose the exact same risks to institutional security as non-religious books and magazines. Specifically, Plaintiffs contend that detainees at the Jail should not be permitted to possess more books and/or magazines than they can fit into a Jail-issued property bag along with their other personal property items. The Jail already requires all detainees to store all of their personal property, save their shoes, in such bags. See Dkt. 120, Def. Brief, at 1.

In his response to Plaintiffs' motion for summary judgment, Defendant Cook County Sheriff Thomas Dart does not dispute that inmates in correctional institutions have a First Amendment interest in access to books and magazines. Rather, Defendant Dart contends that the First Amendment rights at stake here must yield to prison officials' judgment that the three book/magazine policy promotes "safety and security" in the Jail by "mitigat[ing] dangers" associated with inmates' possessing books and magazines. Dkt. 120, Def. Brief, at 12–13.

In the argument below, Plaintiffs show that, (1) Defendants have misapplied the legally controlling, four-part *Turner* test; (2) that declaratory and injunctive relief are available and appropriate remedies; and (3) this is not an appropriate case for Plaintiffs to pursue a post-deprivation remedy in state court.

## II. Argument

### A. Defendant Misapplies the *Turner* Test

The parties agree that the four-prong test set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987) is the appropriate authority by which this Court should evaluate the constitutionality of the jail's restrictions on books. Dkt. 120, Def. Brief, at 9–10. The Sheriff concludes that "*Turner* permits prisons and jails to limit the number of books and magazines inmates can keep in their cells." *Id*. at 21. But the Sheriff's analysis of Turner is deeply flawed. Taking each prong of the test in turn, Plaintiffs show: (1) that the Sheriff has not met its burden to establish that its policy is a rational response to legitimate institutional needs; (2) that the restriction is an exaggerated response to the jail's security concerns; and (3) that easily available alternative exist to the policy.

### 1. First Prong of *Turner*: the Sheriff Has Not Established A Rational Connection Between Its Policy and Stated Interests

The first prong under *Turner* considers whether a rational connection exists between the prison policy and a legitimate governmental interest advanced as its justification. *Turner*, 482 U.S. at 89. Here, the Sheriff argues for the validity of its policy by identifying eleven safety and security risks that books and magazines purportedly present in the Jail;[2] asserting that the three book/magazine policy "is

---

[2] See Dkt. 120, Def. Brief at 5–6 and 12–13 (the eleven are as follows: potential fire hazard; potential risk of clogging the plumbing; potentially risk of clogging ventilation; potential use as a weapon; potential to hide contraband; potential to send coded messages; potential to jam doors; potential to cover cell room windows; potential to cause disputes among inmates; potential to increase the time necessary for guards to do an inspection; potential to cause clutter).

designed to mitigate those dangers ... by limiting the number of books an inmate may keep in his cell." Dkt. 120 at 12–13.

But in justifying the policy based on the aforementioned catalogue of possible harms, the Sheriff misstates its evidentiary burden. In the analysis below, Plaintiffs show (1) the Sheriff has failed to identify the proper evidentiary burden under *Turner*; (2) the Sheriff has failed to provide any evidence of harm caused by allowing inmates to possess non-religious books and magazines, as required under *Turner*; (3) the Sheriff has chosen to ignore the large body of Plaintiffs' evidence showing that there is a lack of a rational connection between the policy and the Jail's proffered security and safety justifications; and (4) the Sheriff has not cited reliable evidence in support of its justifications for the policy.

### a. The Defendant Misstates Its Evidentiary Burden

As Plaintiffs explained in their opening brief, while the Plaintiffs bear the ultimate burden to prove that the three book/magazine policy is unconstitutional, see, *e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), courts considering the constitutionality of prison regulations have long maintained that "reflexive, rote assertions" of the need for a policy are not adequate grounds to justify a restriction that impacts prisoners' First Amendment rights. Courts have long required the government to come forth with evidence that the challenged policy will actually assist in achieving its stated goals. In particular where, as here, evidence is presented to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that

the connection is not so remote as to render the policy arbitrary or irrational." *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) (quoting *Turner*, 482 U.S. at 89-90). See Plaintiffs' opening brief at 13–14.[3 and 4]

Significantly, Defendant's brief does not satisfy or even acknowledge its evidentiary burden and opts instead to cherry pick language from select cases that emphasizes the deference to be paid to the judgments of jail administrators. Dkt. 120, Def. Brief, at 9–10. In so doing, the Sheriff endorses an overly expansive (and legally suspect) view of the deference due to prison officials' judgment under *Turner*, a deference that would, in practice, eliminate any effective judicial review of prison policies that infringe on prisoners' constitutional rights—a point acknowledged by Justice Stevens in his concurrence in *Turner*, 482 U.S. at 100–01, where he

---

[3]  In *Prison Legal News v. County of Cook*, 16 C 6862, 2016 WL 6833977 at16, fn. 8 (N.D. Ill., Nov. 21, 2016) (Gottschall, J.) and *Koger v. Dart*, 114 F.Supp.3d 572, 579, 582 (2015), the courts acknowledged that the Jail bears the evidentiary burden to support the reasonableness of its regulations. See *Prison Legal News* at *8, fn. 8 ("The court takes note of the line of cases holding that prison administrators cannot avoid judicial scrutiny by providing 'reflexive, rote assertions.'") (citations omitted); *Koger* at 579 (affirming that "[t]he Court must…scrutinize the evidence in the record to determine whether the ban can be justified.")

[4]  Additionally, it should be noted that throughout its brief the Sheriff seeks to distinguish the case at hand from the aforementioned cases involving newspapers in the Cook County Jail, calling the cases "completely inapposite." See, *e.g.*, Dkt. 120, Def's Brief, at 8 ("Plaintiffs' citations to case law dealing with complete bans on newspapers [is] completely inapposite.") But the Sheriff's effort to ignore the relevance of these two cases is a fool's errand. First, these cases are far from inapposite. Both *Koger* and *PLN* dealt with application of the *Turner* test to restrictions on detainees' reading materials in the Cook County Jail that the jail sought to justify on the basis of institutional security and administrative burden—the exact legal test at issue here. Second, the Jail mischaracterizes the *PLN* case as a case dealing with an "absolute ban" on newspapers. In reality, that case dealt with the Jail's policy of "selectively allowing" only certain newspapers into the Jail— an issue similar to the Jail's selective regulation of books and magazines at issue here. *PLN* at *2. And third, the two cases are relevant because they reveal the Jail's pattern of imposing harsh restrictions on inmates' access to reading materials in the absence of evidence that the regulations actually advance legitimate penological interests.

explained that "if the standard can be satisfied by nothing more than a 'logical connection' between the regulation and any legitimate penological concern perceived by a cautious warden … [the standard] is virtually meaningless. ... Indeed there is a logical connection between prison discipline and the use of bull whips on prisoners.") See also Dkt. 115, Plaintiffs' Brief, at 22–23 (explaining *Turner*'s emphasis on requiring real-world facts and data as opposed to "abstract logic" to satisfy its test).

In addition, the Sheriff's analysis ignores *Turner*'s neutrality requirement. It is indisputable that the Jail's policy privileges religious materials over secular materials by allowing inmates to possess an unlimited amount of religious materials. See Dkt. 116 at ¶19. This favoring of religious books over non-religious books is at odds with *Turner*'s neutrality principle. Under *Turner*, a valid regulation restricting inmates' First Amendment rights must operate in a neutral fashion, without regard to the content of the expression. See *Turner*, 482 U.S. at 89–90 (explaining that "the governmental objective must be a legitimate and neutral one.") Here, the policy is emphatically not neutral, because it applies only to certain books and magazines based on their expressive content. *Kramer v. Conway*, 962 F. Supp. 2d 1333, 1340, 1345-46 (N.D. Ga. 2013) (upholding a limitation on books because of its neutrality—because it is "a uniformly applied books-in-cell limitation," one in which "the expressive content of books is not considered.")[5]

---

[5]     Per the Jail's differential treatment, the Sheriff argues that this difference in treatment does not violate the Establishment Clause of the First Amendment. Dkt. 120, Def Brief, at 23–24. But separate from the Establishment Clause and focusing only on Plaintiffs' First Amendment claim that the three book/magazine policy unreasonably

### b.    The Sheriff Offers No Real-World Evidence that the Policy Minimizes the Alleged Harms

Defendants have put forth no actual evidence to support their contention that having a three-book limitation that is enforced at the whim of Jail employees enhances prison security. The Sheriff's argument amounts to a mere plea for deference to the Sheriff's judgment that, because there are risks associated with books and magazines, it necessarily follows that the Sheriff's specific policy is constitutionally valid. But the Sheriff's argument is not supportable under the law for at least three reasons.

First, the argument is fundamentally irrational. As explained in Plaintiff's opening brief, inmates are able to possess an unlimited amount of other books, including religious books, law books, substance abuse books, and any and all school/study books, Dkt. 116, SOF, at ¶15, 19; inmates may also possess in their property bags an unlimited amount of paper products, like writing pads, envelopes, mail and/or correspondences, greeting cards, and playing cards (*id*. at ¶¶ 19, 23); and there is no prohibition in the Jail on the amount of loose-leaf papers an inmate may possess. *Id*. at ¶19; see Dkt. 115 at 14-15. All of the harms that Defendant has identified with books and magazines are equally applicable to religious books, law books and writing pads. See *Leachman v. Thomas*, 229 F.3d 1148 (5th Cir. 2000) (Dennis, J., dissenting) ("Religious and correspondence course texts are no less combustible than other publications.")

---

burdens their speech rights, the absence of any restriction on inmates' possession of religious materials shows that the strict numerical limit on non-religious books is simply not necessary to protect the Jail's safety and security.

Second, the Sheriff's argument is based on an unsupported assumption—namely, that restricting the number of non-religious books and magazines reduces the overall amount of paper and/or books in inmates' possession. This assumption is mere guesswork. Given all the other books and types of paper products inmates may possess, inmates are already able to fill up their property bags with permissible books and other paper goods. Moreover, as explained by Plaintiffs' expert, given that there is no prohibition on the amount of loose-leaf papers inmates may possess, Dkt. 116 at ¶19, there is nothing to stop inmates from simply tearing the binding off of their books and/or magazines so that they are loose-leaf in form and thus permissible. Dkt. 117-26, Clark Expert Report, at 7, fn. 4.

Third, even assuming for the sake of argument that the prohibition results in a modest reduction of paper in inmates' position, the reduction in paper is *de minimis* because the overall amount of paper goods, including books and magazines, an inmate may possess is limited by what can be contained in a property bag. Significantly, the Sheriff has acknowledged that a property bag is only large enough to contain only a modest amount of paper products, including books and magazines. See Dkt. 120, Def. Brief, at 11, fn. 4 (explaining that "[B]y the time the property bag is filled with clothing, hygiene items, and commissary food items, there is little room left over for many books or magazines.") This frank admission by Defendant's expert accords with findings by the courts in both *Koger* and *PLN*, each of which laid emphasis on the *de minimis* impact that lifting a restriction on certain reading materials would have on overall paper materials available to inmates, given the

constraints imposed by the property bags.[6] The admission also exposes the over-

heated rhetoric in the Sheriff's brief to be exactly that.[7]

> ### c. The Sheriff Ignores the Substantial Body of Evidence Showing the Lack of a Rational Connection between the Policy and the Jail's Proffered Security and Safety Interests

Plaintiffs introduced a large body evidence in their opening brief showing the

lack of a rational connection between the Jail's policy and its proffered interests,

including showing that the Sheriff's policy is an outlier policy outside the

institutional mainstream (Dkt. 115 at 16); has gone largely unenforced for years

without compromising institutional security (*id*. at 7, 24); was not endorsed by the

federal monitor appointed to oversee safety and environmental conditions at the jail

(*id*. at 8–9; 19–20); and is undermined by the Sheriff's own documentation. (*id*. at

21–22). In response, the Sheriff makes three arguments to defend the rationality of

its policy: (1) that the policy is necessary to reduce the overall amount of materials

in the jail that cause potential safety risks; (2) that the policy is a permissible

---

[6]     See, *e.g., Koger*, 114 F.Supp.3d at 584 ("[B]ecause the jail already limits inmate possessions to a property box, allowing newspapers would not increase the amount of [paper] material in circulation. [N]o reasonable fact finder could find that lifting the ban on newspapers would have more than a *de minimis* impact on the number of fires, clogged toilets, or paper mâché weapons in the jail."); see *Prison Legal News*, 2016 WL 6833977 at *6, fn. 6 ("[A]ssuming the property boxes are still issued to CCJ inmates, defendants' argument that allowing additional newspapers into the jail creates the likelihood of sanitation and security concerns seems somewhat specious.")

[7]     See, *e.g.,* Dkt. 120, Def. Brief, at 5 (asserting that its three book/magazine policy functions as a "limitation…on detainees compiling personal libraries"); *Id*. at 6 (asserting that modifying the three book/magazine policy would "significantly increase[]" burdens on prison staff). The Sheriff's suggestion that this case is about inmates' seeking to build up "personal libraries" is absurd. Plaintiffs have never argued that there should be no limitations on books, but rather contend that there is no rational reason to treat secular books and magazines differently from religious books and writing pads.

behavior-management tool; and (3) that enforcement of the policy has increased to comply with the federal monitor's recommendations. As set forth below, none of these claims withstand scrutiny.

### i. The Policy Does Not Diminish the Amount of Potentially Harmful Materials in the Jail

Seeking to justify its policy by hiding behind unobjectionable generalities, the Sheriff argues that "'diminishing the amount of materials that can be misused by detainees is a legitimate goal of correctional facilities." Dkt. 120, Def. Brief, at 13. This is true as far as it goes, but the issue here is not the abstract right of a prison or jail to control the amount of books and magazines that an inmate in its institution may posses; the issue is the validity of a particular policy—*i.e.* one that harshly restricts secular books while allowing an unlimited number of religious books and writing pads—in its full context.[8] Here, there is no reason to believe that the policy the jail has implemented has any meaningful impact on the amount of books, magazines and paper materials in the jail, given all of the exceptions to the rule; and, even if it did (an unproven assumption), the result would be a *de minimis* reduction, given the volume limitations imposed by use of the property bags.

In addition, this particular policy suffers from under-inclusivity and thus flies in the face of prong one's explicit requirement against "arbitrary or irrational" regulations. *Turner* at 89–90. As explained in Plaintiffs opening brief, it is irrational to allow detainees to possess an unlimited number of religious books, writing pads,

---

[8]    See *Beerheide v.Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) ("*Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights may be curtailed.")

and legal materials, and at the same time argue that institutional safety demands a strict limit on non-religious books and magazines, which jail officials have acknowledged present identical risks. Dkt. 115, Plf. Brief, at 5, 14–15; Dkt. 116, SOF at ¶25–26. Indeed, federal courts have repeatedly held that it is irrational for a correctional institution to regulate one type of inmate activity or property where similar items or activities that present the same risks are permitted.[9] Deference to the judgments of prison officials about institutional safety needs does not mean that Courts should abandon common sense. *Amatel v. Reno*, 156 F.3d 192, 199 (D.D.C. 1998) ("[C]onformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality.") (accord *Mauro v. Arpaio*, 188 F.3d 1054, 1059–1060 (9th Cir. 1999) (en banc), cert. denied, 529 U.S. 1018 (2000); see also Dkt. 115, Plf Brief, at 14–15, 26.

### ii. The Policy Is Not Used as a 'Behavior Management Tool'

The Sheriff's next contention is that pursuant to *Beard v. Banks*, 548 U.S. 526 (2006), the Jail is free to use the limitation on books as "a behavioral management tool." Dkt. 120, Def. Brief at 13. Specifically, the Sheriff contends that the lax enforcement of the three-book rule is "a behavior management tool to

---

[9]     See *Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982) (ban on hardback books was "unreasonable" when "other paper and nonpaper material (*e.g.*, shoes) could just as easily jam toilets or cause injuries to guards when thrown by inmates"); *Mann v. Smith*. 796 F.2d 79, 82–83 (5th Cir. 1986) (ban on newspapers and magazines was unreasonable where "the inmates were permitted to have softcover books" and "writing paper and toilet paper were freely available."); *Peppering v. Crist*, 678 F.2d 787, 790 (9th Cir.1982) (concluding that prison officials could not prohibit receipt of *Hustler* where they allowed prisoners to receive *Playboy*); and *Jordan v. Pugh*, 504 F.Supp.2d 1109 (D. Colo. 2007) (prohibition on inmates publishing under a byline in the news media was invalid in light of "myriad of similar publishing opportunities available to inmates" that posed similar risks.)

reward detainees who comply with other rules by rewarding them with extra property for good behavior." *Id.* at 5. This argument fails for two reasons.

First, the idea that the three-book policy is a behavior management tool is a fiction. The policy does not punish bad behavior or reward good behavior—*i.e.*, inmates' books are not taken away as a punishment or given back as a reward for good behavior. Rather, the policy simply says that inmates may not possess more than three books and/or magazines, and whether to enforce the policy is entirely up to the discretion of individual supervisors, some of whom enforce the policy strictly and some of whom don't. See Dkt. 117-3, Dep of Giunta, at 87:15–21 ("Q. So it depends on the individual supervisor whether the rule is going to be enforced? A. Correct."); Dkt. 117-6, Dep of Moreci, at 89 ("Q: So if a particular supervisor believes it's important to enforce the three-book policy, they have the authority to do that? A. Yes. Q. And likewise they have the authority to make the opposite decision …, true? A: Yes.") Likewise, jail officials admitted that they do not even inform inmates of the circumstances under which the three-book rule will be enforced or that lax enforcement can be a reward for good behavior. Dkt. 117-6, Dep of Moreci, at 92:1–16 ("Q. [Are you] aware of any policy in the jail about informing inmates that the three-book policy won't be strictly enforced? A. No. … Q. Are inmates given any information about what might trigger strict enforcement of the rule? A. No.") Plaintiffs' expert John Clark noted that an administrative practice of unpredictable and uneven enforcement of written policies does not enhance security, but rather serves to normalize a disregard for Jail rules. See, Dkt. 117-26, Clark Report, at 8-9.

Second, the Sheriff's reliance on *Beard* is badly misplaced. In *Beard*, the Supreme Court upheld a Pennsylvania prison regulation limiting access to newspapers, magazines, and photographs by inmates placed in the prison's long-term segregation unit. But the key to the Court's decision was that the policy at issue was designed to address only a special class of prisoners— "a group of specially dangerous and recalcitrant inmates," *id.* at 525, the "worst of the worst" inmates, which comprised about "0.01 percent of the total prison population," literally about forty inmates in total. *Id.* at 530. The prison's purpose for the restrictions was to motivate better behavior on the part of these "particularly difficult prisoners." *Id.* at 531. The Supreme Court explained that "the deprivation of virtually the last privilege left to an inmate (*i.e.*, access to newspapers and books), is a significant incentive to improve behavior," adding that "withholding such privileges 'is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose'." *Id.* 531–32, 533 (citations omitted). Unlike in *Beard*, the restriction on books and magazines in the case at hand applies to all detainees in the Cook County Jail, literally thousands of individuals; it is not focused on improving behavior of incorrigible inmates, and thus the logic of *Beard* simply does not apply.[10]

---

[10]   As a general matter, courts accord much more discretion to prison disciplinary sanctions than comparable denials to all inmates. Prior to the *Beard* Court's application of this principle, the Supreme Court recognized that "*Turner*'s principle of deference has special force with regard to" the treatment of "inmates presenting special disciplinary and security concerns." *Lewis v. Casey*, 518 U.S. 343, 361 (1996).

### iii. The Jail's Enforcement Practices Have Not Changed as a Result of Federal Monitoring

The third argument the Sheriff offers to counter the evidence presented by Plaintiffs is that enforcement of the policy has increased "since federal monitoring of the jail began" in order to bring the jail into compliance with the monitor's recommendations. Dkt. 120, Def. Brief, at 13. This argument is intended to counter the evidence presented in Plaintiffs' opening brief showing that the Sheriff's history of lax enforcement of the three-book policy has not compromised safety and security, thereby giving the lie to the Sheriff's argument that the rule is necessary. See, Dkt. 115, Plf. Brief, at 18.

The Sheriff's argument is demonstrably false. First, the Sheriff's claim is unsupported by any factual data; it is supported by mere assertion. But second and more importantly, the assertion is belied by the actual evidence. Plaintiffs deposed Director Daniel Moreci on September 8, 2015, long after the initiation of the federal monitoring began in 2010, and he estimated that 95 percent of inmates in the Cook County Jail have more than three books or magazines. Dkt. 116, SOF at ¶28. Likewise, Plaintiffs deposed Sergeant Peter Giunta on September 4, 2015, and when asked, "Other than if the cell is dirty or cluttered, is the three-book rule ever enforced?," he testified, "Not really." *Id*. at ¶28. For full discussion, see Dkt. 115, Plf. Brief, at 6–7.[11]

---

[11] The enforcement or lack of enforcement of the policy is not the ultimate issue. By its own terms, the regulation applies to all inmates at all times. The policy is set forth in the Inmate Handbook, Dkt. 117-8, which is given to all inmates. The penalties for violating it can result in discipline and/or criminal charges against an inmate. Dkt. 116 at ¶¶17-18. Enforced or not, its existence has a chilling effect on some inmates' behavior. See *Initiative*

### d. The Sheriff Has Not Cited Reliable Evidence In Support Of Its Justifications For The Policy

The Sheriff relies on Tim Gravette's expert report in support of its contention that the policy enhances prison security. Dkt. 120, Def. Brief, at 6–7. But Mr. Gravette's expert opinion is not based on any actual evidence or facts in this case. He has acknowledged that he did not read any of the relevant documents in this case, including the depositions, the Jail's incident reporting database, the Sanitation and Safety Reports, the Monitor's reports, or the memoranda addressing fires. Dkt. 117-34, Gravette Expert Report, at 10. It may be true that Mr. Gravette is qualified to opine on a variety of topics germane to jail and prison matters, but his lack of meaningful analysis and review of the evidence in this case makes his analysis decidedly unhelpful.[12]

Despite the lack of reliability of Mr. Gravette's report, it deserves to be emphasized that even he agreed that the Jail's policy imposing a numerical three-book/magazine limitation for non-religious books on top of the volume limitation imposed by the use of a property bag is an outlier among penal institutions (he could not identify one other institution that did the same). He referred instead to

---

*and Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299, 1318 (D.C. Cir. 2005) (finding that the Postal Service's policy of not enforcing the regulation on perimeter sidewalks could not "alone temper the regulation's chill of First Amendment rights.")

[12] See *Bourelle v. Crown Equip. Corp.* , 220 F.3d 532, 537 (7th Cir. 2000) ("[T]his court treats the reliability of an expert's opinion in a particular case separately from his or her overall qualifications"); see also *Clark v. Takata Corp.*, 192 F.3d 759 n.5 (7th Cir. 1999) ("[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."); *Minasian v. Standard Chartered Bank PLC*, 109 F.3d 1212, 1216 (7th Cir.1997) (warning that judges should "not be deceived by the assertions of experts who offer credentials rather than analysis.")

the system employed by federal bureau of prisons, which allows facilities to impose *either* a volume limitation or a numerical limitation on inmate property, but not both. Dkt. 117-33, Gravette Report, at 6; see also Dkt. 117-26, Clark Report, at 13.

In arguing for the reasonableness of its policy, the Sheriff also claims that the "Federal Monitor approved of both the volume and numeric limits." Dkt. 120, Def Brief, at 11, fn. 4. But the Sheriff has not cited any source for this claim. Defendant merely points to an anonymous, typed comment on draft of the Inmate Handbook and claims, without any foundation, that Mr. Grenawitzke (whom Plaintiffs were not allowed to depose due to the Agreed Order entered in *USA v. Cook County*) made the comment. This is not a proper record citation for summary judgment purposes. Moreover, the assertion flies in the face of all 13 of Mr. Grenawitzke's monitor's reports. As the court-appointed expert on environmental safety and perhaps the single person most invested in putting in place a proper program to control combustibles in the Jail, Mr. Grenawitzke never identified the need to impose a numerical limit on the number of books and magazines that inmates could possess but instead always emphasized the requirement that inmates maintain their personal items, including books and magazines, in the Jail's property bag. Dkt. 116, SOF at ¶¶ 43-45; see also Dkt. 115, Plf Brief at 8, 19-21.

### 2. The Second Prong of *Turner*: The Ban Does not Leave Open Adequate Alternative Channels

The second prong of the *Turner* test examines whether the challenged prison regulation leaves open "alternative means of exercising the right." *Turner* at 90. The Sheriff argues alternatives are available here, first, because detainees can

obtain information by "receiv[ing] visitors, mak[ing] phone calls, writ[ing] letters, and watch[ing] television," Dkt. 120, Def. Brief at 14. But Judge Kennelly rejected this exact argument in *Koger*. See *Koger* at 580-581 ("[T]he right at issue is not simply a general right to read or find out about the news."); see also Dkt. 115, Plf. Brief, at 25.

Second, the Sheriff argues that adequate alternatives exist because the policy is not an absolute ban on books and inmates can still have up to three non-religious books and/or magazines and receive new books as they discard their old ones. Dkt. 120, Def. Brief, at 14–15. It is true that the policy is not an absolute ban, but that is not dispositive. If it were, jails and prisons would be justified in restricting inmates to just one book/magazine and arguing that their policy satisfied the adequate availability of alternatives test. That is not the case. Courts routinely hold that restrictions burdening inmates' access to reading materials of their choice have significant First Amendment implications, even if they do not impose an outright ban on inmates' ability to read and possess books. See, *e.g. King v. Federal Bureau of Prisons,* 415 F. 3d 634, 638 (7th Cir. 2005) (finding a prison's "refusal to allow [an inmate] to obtain a book on computer programming presents a substantial First Amendment issue"); *Lindell v. Frank*, 377 F.3d 655 (7th Cir. 2004) (ban on "clippings and copies" of publications violated First Amendment although inmates were permitted to obtain entire books and magazines); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (allegation that jail "arbitrarily" denied prisoner's request for library visits stated a First Amendment claim.); see discussion at Dkt.

115, Plf. Brief, at 11. The Sheriff's policy certainly implicates Plaintiffs' First Amendment rights by regulating the quantity and content of inmates' reading materials, even though it is not an absolute ban.[13]

The relevant inquiry in a First Amendment challenge to a jail or prison policy is not whether the policy imposes an absolute ban, but whether the policy that burdens an inmates' First Amendment rights can be justified as reasonable and necessary. The answer to that question depends (primarily) on whether the policy promotes the safety and security interests it is intended to serve.

3.   **The Third Prong of Turner: The First Amendment Rights at Issue Here Can Be Accommodated Without Significant Burden on the Jail**

The third factor of the *Turner* analysis examines "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner* at 90. The Sheriff contends that "accommodation of Plaintiffs asserted right would dramatically impact the work of Cook County Jail staff, and increase dangers for Cook County Jail staff." Dkt. 120, Def. Brief, at 16. Defendant simply repeats the claims made in its analysis of prong one—namely, that books as a general matter present "security risks" and

---

[13]   A restriction can impinge on the First Amendment merely because it is unduly burdensome. See *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 753 (2011) ("[T]he State's chosen method is unduly burdensome and not sufficiently justified to survive First Amendment scrutiny.") Here, the policy impedes the ability of inmates to freely read books and magazines of their choosing, as well as the ability of outsiders to share reading materials with inmates at the Jail. In *Beard,* Justice Stevens explained that limitations on inmates' access to reading materials "strikes at the core of the First Amendment rights to receive, to read, and to think." 548 U.S. at 543 (dissent). As in *Beard*, the Sheriff's restrictions here strike at the heart of Plaintiffs' First Amendment interests.

"sanitation" concerns and that allowing Plaintiffs to keep more than three books

and/or magazines "would increase the burden on the staff required to maintain a

safe, secure, sanitary an functional jail environment." *Id*. at 16. Plaintiffs' response

is correspondingly the same too—the Sheriff's argument constitutes a legally

inadequate, unsupported assertion that ignores the evidence, including Jail officials'

own testimony.[14] See full discussion in §I(A)(1), *supra*.

In support of its argument, the Sheriff calls attention to the Cook County Jail

incident reports. Dkt. 119-3. The Sheriff claims the incident reports show that

"books and magazines have been misused in various ways at [the Cook County

Jail]." Dkt. 120, Def. Brief, at 16. This vague, one-sentence assertion constitutes the

totality of the Sheriff's analysis of these reports. A review the highlighted incidents

reveals why. The Sheriff highlighted in yellow all incidents allegedly "involving" the

misuse of books and magazines in the Jail, see Dkt. 119-3, but a large percentage of

these incidents (22 out of 97) involve Jail officials finding contraband in books and

magazines pursuant to inspections performed in the Jail's mailroom—long before

reading materials ever get to the inmates. Such incidents are irrelevant to this case

because outsiders' attempts to smuggle contraband into the jail through the mail

would not be altered by modification of the three-book rule.

---

[14]     In particular, the argument ignores that inmates can already possess an unlimited
number of religious books and writing pads; it ignores the history of non-enforcement of the
policy; and it ignores the admissions by Jail officials that non-enforcement does not
jeopardize Jail security or impose undue burdens on jail staff. Defendant's argument also
ignores its own expert's observation that there is a rather modest amount of space for any
extra paper in a property bag, including for books and magazines, thereby insuring that
allowing inmates to possess as many non-religious books and magazines as can fit into a
property bag would not cause a major disruption.

In addition, there is nothing remarkable about these incidents or their numbers. The data includes all incidents from February 2012 though December 2015 involving books and magazines. Excluding the mail room incidents where contraband was found hidden in mail, there were a total of 75 total incidents in four year's time (47 months to be exact), fewer than two incidents a month.[15]

Legally speaking, the issue is not whether books have ever been "misused" by inmates in the Jail—of course they have. The issue is whether allowing inmates to possess as many non-religious books and magazines as they can store in their property bags will create additional safety and security problems for the Jail. And the answer to that question is clearly "no." The three-book/magazine policy has been sporadically enforced for years, Dkt. 116, SOF ¶31, and Jail Director Moreci, Chief Environmental Health Specialist Bruce Schroer, and Chief of Staff Matthew Burke have all testified that the Cook County Jail has experienced no harmful effects as a result of its lack of enforcement. *Id*. at ¶35. The fact that the restrictions on books and magazines have not been enforced and the Jail is safe is a strong indication that the restriction is not necessary.

---

[15] Thirteen of the incidents involved inmates "throwing" a book or magazine at someone; one incident involved an inmate merely threatening to "throw" a book at someone. Seven incidents involved arguments between inmates over books. Three incidents involved inmates using staples from magazine bindings to cut themselves. Three incidents involved inmates attempting to use books to light a fire (milk cartons and bedding were used for the same purpose). Many of the incidents were wholly benign, such as books that got wet due to a flooded cell. Significantly, the records rarely identify the specific content of the books or magazines involved in any of these incidents. One incident on 9/19/13, however, does identify contraband being hidden in a "Daily Prayer Book." See, Dkt. 119-3 at 9.

### 4. The Fourth Turner Prong: the Three-Book Restriction Is an Exaggerated Response to the Jail's Security Concerns, and There Exist "Obvious, Easy Alternatives"

The fourth factor of the *Turner* test, closely related to the third, requires courts to consider whether there are alternatives to the restriction that would suggest that the policy is an "exaggerated response" to the identified security concerns. *Turner* at 90. The Supreme Court has explained that the "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989).

Here, as Plaintiffs made clear in their opening brief, the property bags fully satisfy *Turner*'s requirement of offering an "obvious, easy alternatives." The bags have the virtue of already being in use at the Jail and are a popular and effective means of controlling the volume of inmates' reading material in penal institutions throughout the county. See Dkt. 115, Plf. Brief, at 16-17. The Sheriff's response to the ready availability of property bags as an alternative is to dismiss the idea by saying that "prison officials do not have to attempt every conceivable alternative method." Dkt. 120, Def. Brief, at 17. Its glib dismissal is not a serious or adequate response to this matter.

Instead of addressing the issue whether the property bags offer an "obvious, easy alternative[]" to the numerical restrictions, the Sheriff argues that prong four is satisfied because the three book/magazine limitation is necessary to reduce the

amount of time it takes to perform cell searches. Dkt. 120, Def. Brief, at 18. This argument is highly suspect for at least five reasons.

First, the Sheriff has produced no evidence, data, figures, studies or statistics to support its claim that the Jail would have to divert staff resources to searching for hidden contraband in non-religious books and magazines as opposed to the religious books, legal books, study books and writing pads that are already allowed without numerical limitation.

Second and more pertinently, the Sheriffs claims are at odds with the testimony of Jail officials who stated that non-enforcement of the three-book rule has created no adverse effects. In particular, Sgt. Guinta, who has worked as a supervisory correctional officer with responsibility for overseeing cell searches, testified that the only problem posed by books was "normal little squabbling" between inmates. Dkt. 116, SOF ¶36. Likewise, Director Moreci, Chief Environmental Health Specialist Bruce Schroer, and Chief of Staff Matthew Burke have all testified that the Cook County Jail has experienced no harmful effects as a result of the lack of enforcement of the three-book limit. *Id*. at ¶35. Dkt. 116-4, Dep of Schroer, at 64 ("Q. Has the lax enforcement of the three book or magazine policy set forth on page 16 [of the Cook County Jail Inmate Handbook] caused the jail to go out of compliance with the DOJ's recommendations about control of flammable materials? A: It has not."); Dkt. 116-6, Dep of Moreci, at 93:8-11 ("Q: In your judgment, do you think that prison security is endangered by the sporadic enforcement of the three book or magazine policy? A. No."); Dkt. 116-5, Dep of

Burke, at 33 ("Q. Has anyone told you that the lax enforcement is causing a risk in the jail? [objection omitted] A. I don't believe so.")

Third, logically speaking, the Jail's argument doesn't hold up, given the many other types of paper inmates are allowed to possess in their property bags which create an equal (or greater) burden than searching through a book or magazine. A thorough search by a correctional officer requires searching through all the paper in an inmates' property bag. There is no restriction on the overall amount of paper in a property bag and no limit on religious books, law books, writing pads, and legal materials. In addition, there is also no limit on correspondence, envelopes, or folders for legal materials (envelopes and folders can be purchased from the Jail commissary). If there is no limit on any of these items, the necessity of restricting the number of non-religious books and magazines seems questionable.

Fourth, the Sheriff's argument is undergirded by the notion that fewer secular books and magazine will result in less material to search through overall, but that doesn't necessarily follow: inmates may substitute other books or/or more mail and envelopes and legal papers, all of which must still be searched.

And fifth, realistically speaking, any increase in search time would be *de minimis. Turner* at 91. The Sheriff's own expert has acknowledged that the space for paper goods, including books and magazines in a property bag is quite limited. Dkt. 120, Def. Brief, at 11. It thus follows that managing the presence of any additional books and magazines associated with modifying the existing policy would not pose any "massive" burden on Jail resources but would come at a *de minimis*

cost. See *Koger*, 114 F.Supp.3d at 584; *Prison Legal News*, 16 C 6862 (Nov. 21, 2016) at *6, fn. 6; see also *Morrison v. Hall*, 261 F.3d 896, 902 (9th Cir. 2001) ("In light of the regulation limiting the total amount of property in a cell, ... permitting inmates to receive for-profit, subscription publications could not possibly increase the total volume of cell materials.")

The Sheriff's final argument under prong four of the *Turner* test is its proffer of six cases it claims support the validity of the Jail's strict numerical restriction of non-religious books. Dkt. 120, Def. Brief, at 19-21. But, as set forth below, the cases are easily distinguishable for several reasons—principally because none of them, save one, addresses the availability of property bags (or any other type of storage bin) as an "obvious, easy alternative[]" to the numerical restrictions imposed; and none of the cases involves a policy that imposes a numerical restriction only on non-religious books in violation of *Turner*'s neutrality principle.

1.  In *Harrison v. Calderon*, 1997 U.S. Dist. LEXIS 6484, No. C-95-3635 (N.D.Cal. May 6, 1997), the court upheld the policy of limiting "Grade B" inmates to three books and two magazines. Dkt. 120 at 19. The restrictions imposed in *Harrison* were, as in *Beard*, limited only to the most recalcitrant death row inmates at San Quentin State Prison, so-called "Grade B" inmates, a status "reserved to inmates engaged in violent or escape behavior" and the restriction was imposed "to provide incentive for good in-prison behavior." 1997 U.S. Dist. LEXIS 6484, No. c-95-3635 at *2, fn. 5.

2.  In *Kramer v. Conway*, 962 F. Supp. 2d 1333, 1340 (N.D. Ga. 2013), a plaintiff challenged a wide array of restrictions imposed at a Georgia county jail that prevented him from practicing his Orthodox Jewish faith, including a policy restricting inmates to possessing a maximum of four soft-cover books. The case was a brought under the Religious Land Use and Institutionalized Persons Act (RUILPA) and the First Amendment's free exercise clause. The Plaintiff did not challenge the jail's general restriction books on First Amendment speech grounds.

But the court did address the validity of the four soft-cover book restriction under the free exercise clause and upheld the restriction because if its neutrality—*i.e.*, because it is "a uniformly applied books-in-cell limitation," *id*. at 1345, one in which "the expressive content of books is not considered." *Id*. at 1346. This very clearly distinguishes it from the case at hand, where the Sheriff's policy favors religious books and magazines over secular books and magazines.

3.   *Dayringer v. Mansfield*, 2012 WL 625176, No. 08-4128 (W.D. Mo. Feb 24, 2012) is a RLUIPA case in which the court upheld a prison's six-book limit, finding that "the policy does not impose a substantial burden upon plaintiffs' study of their [religious] beliefs." *Id*. at *12. The case is distinguishable because the court found that "plaintiffs have not shown that an alternative existed that fully accommodated their rights at a *de minimis* cost to valid penological interests." *Id*. at *14. This distinguishes the case from this one, where a ready and available alternative (*i.e.*, the use of property bags) has been shown to exist. The case can also be distinguished because the six-book restriction is neutral and not content-based, applying to any and all books. *Id*. at *13.

4.   In *Clem v. Clarke*, 2014 WL 991307, No. 7:13-cv-00093 (W.D.Va. Mar. 13, 2014), the court upheld a policy limiting inmates to twelve magazines, catalogs, or other periodicals; thirteen books; and one newspaper; and as many newspaper and magazine clippings as can be stored in his locker or cabinet. *Id*. at *1. In addition, detainees could also have up to seven more books than this in their possession at any one time if they are obtained them from the prison (19 books total). *Id*. at *1, fn. 4. The testimony was that these numbers were based on what in fact can fit into an average storage bin at the jail. *Id*. at *2. Unlike here, the book restriction was neutral and not content-based.

5.   *Leachman v. Thomas*, 2000 U.S. App. LEXIS 39809 (5th Cir. Aug. 9, 2000) is an unpublished Fifth Circuit opinion, *id*. at fn. 1, in which a divided panel upheld a restriction prohibiting jail inmates from possessing more than three publications at one time (excluding religious and correspondence course materials).The majority upheld the restriction. *Id*. at *9. The dissenting judge noted that the exceptions to the three-book rule for religious and correspondence course materials undermined the jail's assertion that the restriction was "rationally related to a legitimate and neutral governmental objective." *Id*. at 7. The dissent explained that "religious and correspondence course texts are no less combustible than other publications." *Id*. at 7. There was no talk in the opinion whether a

property bag was available at the jail to provide an "obvious, easy alternative[]" to the strict numerical restriction.

6. *Buff v. Stirling*, 2015 U.S. Dist. LEXIS 177407 at *6-16, (D.S.C Nov. 2, 2015) is inapposite because, like in *Beard*, the challenged policy applied only to inmates in disciplinary segregation.

For all of the reasons set forth above, the Jail's three-book policy fails under *Turner* and Plaintiffs are entitled to summary judgment in their favor.

## B. Plaintiffs Have Standing to Seek Either an Injunction or a Declaratory Judgment

The Sheriff asserts that none of the three Plaintiffs has standing for declaratory or injunctive relief. Dkt. 120, Def, Brief, at 24-26. But, as shown below, its arguments are inconsistent with established law.

As concerns Plaintiff Koger, given that he is no longer in Jail and no longer subject to the policy, his request for injunctive relief is moot, but the law is clear that he may still pursue nominal and compensatory damages, as well as his request for a declaratory judgment as a predicate to an award of nominal damages. See *Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009) ("When a claim for injunctive relief is barred but a claim of damages remains, a declaratory judgment as a predicate to a damages award can survive."); see also, *Koger* at 577.

As concerns Plaintiffs Lyons and Carter, the Sheriff argues that, as civilians who seek to communicate with individuals housed in the Jail, they lack standing because they face no alleged harm because of any Jail policy. To the contrary, for more than four decades it has been clearly established that the "censorship of prisoner mail works a consequential restriction on the First and Fourteenth

Amendment rights of those who are not prisoners" and that the interests of senders and their intended recipients are "inextricably meshed." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974) (overruled in part on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989)). The Court in *Turner v. Safley* affirmed the controlling view that the rights of non-prisoners exist separately from those of inmates. *Turner*, 482 U.S. at 97. In *Thornburgh*, the Court once again confirmed its view that the First Amendment interest of an outsider and that of an inmate are separate and independent from each other, writing: "It is [] certain that '[p]rison walls do not form a barrier separating [] inmates from the protections of the Constitution,' nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Id*. at 407.

Simply put, Defendant's policies directly interfere with Plaintiffs' ability to communicate with inmates at the Jail unduly and unnecessarily restricting their ability to send more than three books and/or magazines to an inmate without at least some of the materials being discarded. This alone gives them standing to pursue injunctive relief. See *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002) (A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" is violating the First Amendment.)

Moreover, the policy's chilling effect on Plaintiffs has been well established. Plaintiffs Carter and Lyons have already suffered harm from the policy, when

various books they sent to detainees at the jail were confiscated during the October 5, 2013 search in the Jail and never seen again. Dkt. 115, Plf. Brief, at 2-3. Lyons continues to fear that she will be subject to the policy and refrains from sending books to inmates at the Jail, although she wants to do so.[16] While it is true that an assertion that future harm may occur based on an instance of past harm is generally insufficient to support a claim for injunctive relief, that is only the case where the harms are unaccompanied by any continuing, present adverse effects. See *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1067 (7th Cir. 1976) ("Because plaintiffs have shown a specific pattern of conduct, akin to an explicit policy, they have demonstrated a reasonable likelihood of future harm, justifying their request for injunctive relief"); see also, *Hvorcik v. Sheahan*, 870 F. Supp. 864, 869 (N.D. Ill. 1994) (allegations of an ongoing policy can be enough to support a request for injunctive relief.) Here, there is no dispute that the policy remains in full effect, and Lyons' own testimony confirms that she continues to fear she will be subject to it.

---

[16]     Plaintiffs Lyons and Carter have certainly not admitted, as Defendant has incorrectly alleged, that the Jail's policy "does not impact [them] in any way." To the contrary, Lyons testified that the jail's book and magazine policies have prevented her from communicating with inmates at the jail—something she wants to do and perceives as "so important." Dkt. 117-2, Dep of Lyons, at 113 ("I am angry ... that I've been stopped from communicating and sharing what I think is so important. ... Because the books have been taken away. And I would be nuts to send more books to anybody."); *Id.* at 50 ("that was pretty shocking to me when he sent out word that all the books except three were gone. And, you know, I just figured my right to communicate with my friend had been, you know, slashed. And I just -- not that these books are that expensive, but the mailing and the effort and why was I going to -- Why would I send them if he wasn't able to get them?") Carter testified that she wanted to send books and magazines to her husband Jerry Collins who was incarcerated at the jail, but was deterred from doing so due to the jail's history of confiscating reading materials and her knowledge of the three-book limit. Dkt. 119-4, Dep. of Carter, at 122-123 (testifying that she "stopped sending" books after learning of the three-book limit and the occasions on which Collins' books were confiscated because it was a "waste of time" and money).

This Court has already recognized that these facts are sufficient to confer standing to seek injunctive relief. In denying the Sheriff's Motion to Dismiss on standing grounds, this Court wrote as follows:

> Lyons ... claims that her long-standing practice of corresponding with inmates and sending books has been chilled by the CCJ's policy and arbitrary enforcement. Wrongfully confiscated property and chilled speech are injuries that unquestionably support standing, ... and therefore Plaintiffs have sufficiently alleged an injury in fact. Clearly, those alleged injuries are also traceable to Defendants' conduct, and a favorable decision by this Court (*e.g.*, an injunction or damages) would remedy the alleged harm.

Dkt. 29 at 5.

## C.     *Zinermon v. Burch* Is Irrelevant to this Matter

Finally, the Sheriff mistakenly argues that *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) requires Plaintiff Koger to "file[] a tort action for the recovery of property in state court, rather than the Federal §1983 action which he did file." Dkt. 120, Def. Brief, at 26-28. *Zinermon v. Burch* concerns the ability of plaintiffs to use §1983 when alleging a fourteenth amendment procedural due process violation. Here, Plaintiffs do not allege a procedural due process violation.  The case is inapplicable and the Sheriff's argument off-point.[17]

## CONCLUSION

For the reasons stated above and in Plaintiffs' opening brief, Plaintiffs respectfully request that this Honorable Court deny Defendant Dart's motion for

---

[17]     For purposes of clarification, Plaintiffs note that the Sheriff has an entire section in its brief, titled the "Cook County Jail's Policy Is Not Confusing." Dkt. 120, Def. Brief at 22-23. Plaintiffs claim is not that the jail's policy is confusing and thus Plaintiffs have not responded to these arguments.

summary judgment in its entirety and grant summary judgment in favor of

Plaintiffs Lyons and Koger and against Defendant Dart.


Respectfully submitted,

/s/ Mark G. Weinberg
/s/ Adele D. Nicholas
*Counsel for Plaintiffs*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
773-283-3913

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
847-361-3869