IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY KOGER,                    )
                                  )
                  Plaintiff,      )
                                  )          No. 14 C 6361
        v.                        )
                                  )          Magistrate Judge
THOMAS J. DART and COOK           )          Maria Valdez
COUNTY, ILLINOIS,                 )
                                  )
                  Defendants.     )
                                  )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Plaintiff's Motion for Reconsideration
of Denial of Plaintiff's Motion for Summary Judgment [Doc. No. 175]. For the
reasons that follow, Plaintiff's motion for reconsideration is granted, and the Court's
prior order [Doc. No. 171] is vacated. Plaintiff's Motion for Summary Judgment
[Doc. No. 115] is denied, and Defendants' Motion for Summary Judgment [Doc. No.
118] is granted.

## DISCUSSION

## I.    MOTION FOR RECONSIDERATION

Plaintiff has moved the Court to reconsider its June 26, 2019 order granting
Defendants' motion for summary judgment and denying Plaintiff's motion. *See
Koger v. Dart*, No. 14 C 6361, 2019 WL 2616992 (N.D. Ill. June 26, 2019). In that
opinion, the Court determined that because no damages claim survived after
appeal, summary judgment in Defendant's favor was warranted. Specifically, the

Court found that the lone property damage claim described by the Seventh Circuit in *Lyons v. Dart*, 901 F.3d 828 (7th Cir. 2018), was a procedural due process claim that was not pleaded and thus could not salvage Plaintiff's suit. Plaintiff contends that the Court committed a manifest error of law by not ruling on the merits of his First Amendment claim after the matter was vacated and remanded in part by the Seventh Circuit.[1]

A party moving to alter or amend a judgment under Federal Rule of Civil Procedure 59(e) "must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 955 (7th Cir. 2013) (citation and internal quotations omitted). A district court's ruling on a Rule 59(e) motion is reviewed under an abuse of discretion standard, meaning that it will not be disturbed unless "no reasonable person could agree with the decision to deny relief." *Id.* "A 'manifest error' is not demonstrated by the disappointment of the losing party." *Oto v. Metro. Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir. 2000). Rather, "[i]t is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Id.*; *see Burritt v. Ditlefsen*, 807 F.3d 239, 253 (7th Cir. 2015). A Rule 59(e) motion "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could or should have been presented to the district court

---

[1] The Court assumes familiarity with the somewhat convoluted procedural history of the case.

prior to the judgment." *Popovitis v. Circuit City Stores,* 185 F.3d 726, 730 (7th Cir. 1999).

Plaintiff's claim of property damage for the loss of his books was properly treated as an unpleaded procedural due process claim. The complaint alleges his First Amendment rights were violated by the policy forbidding him from having more than three books in his cell, not by a policy related to the ultimate disposition of the books after confiscation. According to Plaintiff, the constitutional violation occurred upon removal of the books from his cell and existed whether the books were destroyed, put into the jail library, or maintained and returned to him upon release.

If the books were impermissibly destroyed in violation of Plaintiff's procedural due process rights, the relevant inquiry would have been whether CCJ had a constitutionally adequate pre-deprivation process to deal with the confiscated materials. *See Lyons*, 901 F.3d at 830 ("[G]iven the nature of the [three-book] policy (as Koger describes it), some form of pre-deprivation process – such as asking a prisoner to designate what should be done with the excess books – would have been practical."); *see also Miller v. Downey*, 915 F.3d 460, 464 (7th Cir. 2019) (noting that a prisoner's Fourteenth Amendment due process claim that a mailed newspaper was unconstitutionally confiscated and destroyed is separate from his First Amendment claim); *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (explaining that a prisoner's claim that an alleged deprivation of a property interest in books is properly brought pursuant to the Fourteenth Amendment); *Michalowicz v. Vill. of*

*Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008) ("To state a procedural due-process claim, a plaintiff must allege (1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation."). However, Plaintiff did not allege a procedural due process violation, and he never asked the Court to reconsider its November 13, 2018 decision denying his motion to add such a claim after the case was remanded.

Plaintiff also does not dispute that, having been released from the CCJ prior to filing the lawsuit, he lacked standing to obtain First Amendment injunctive relief. *See Lyons*, 901 F.3d at 830; *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 860 (7th Cir. 2018). Thus, the thin reed on which Plaintiff's entire lawsuit presently rests is his prayer for nominal damages of $1.00 for the First Amendment violation. *Cf. UWM Student Ass'n*, 888 F.3d at 859 & n.4 (explaining that where a plaintiff seeks only injunctive relief, mootness/lack of standing disposes of the entire claim).

In its rulings on summary judgment, this Court concluded that Plaintiff's prayer for nominal damages claim fell along with his requests for injunctive and declaratory relief. *See Peterson v. Vill. of Downers Grove*, 150 F. Supp. 3d 910, 926 (N.D. Ill. 2015); *Freedom from Religion Fndn., Inc. v. City of Green Bay*, 581 F. Supp. 2d 1019, 1029-30 (E.D. Wisc. 2008) (holding that a claim of nominal damages alone does not satisfy Article III's case or controversy requirement and that "for justiciability purposes, there is no reason to treat nominal and declaratory relief differently"); *see also UWM Student Ass'n*, 888 F.3d at 862 ("To the extent plaintiffs seek a declaratory judgment to secure emotional satisfaction from a declaration that

they were wronged, that will not save their claims from being dismissed as moot."). The Court is thus unconvinced that Plaintiff has shown the summary judgment order contained a manifest error. Nevertheless, in an effort to eliminate at least one appealable issue and save some litigation costs in this five-year-old case alleging no actual damages from the constitutional violation,[2] the Court will grant the motion to reconsider in order to address the underlying merits of Plaintiff's claim that he suffered a constitutional deprivation from CCJ's three-book policy.

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Facts[3]

Plaintiff Gregory Koger was serving a 300-day sentence between July and October of 2013, in the Cook County Jail ("CCJ"). (Pl.'s LR 56.1(a)(3) at ¶1.) During this time, Koger asked friends to send him books and other reading materials. (*Id.* at ¶4.) Jail records show that during his sentence, Koger received forty-two books and one magazine. (*Id.* at ¶2.) While it is disputed whether Koger was allowed to possess more than three books in his cell, it appears that for most of his detention, Koger physically possessed more than three books in his cell at a time. (*Id.* at ¶3.)

---

[2] As the late Judge Evans opined in another case where Plaintiff sought only nominal damages: "So when all is said and done, the State of Illinois has spent a lot of money defending this case for six years. Koger may end up with a dollar, and his lawyer . . . will get a limited amount of attorney's fees. A waste of time? Some may disagree, but I lean towards saying 'yes.'" *Koger v. Bryan*, 523 F.3d 789, 805-06 (7th Cir. 2008) (Evans, J., concurring).

[3] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

On October 5, 2013, CCJ corrections officers searched Deck 3A of Division 10 jail, where Koger was housed. (*Id.* at ¶5.) Plaintiff claims that correctional officers confiscated more than thirty books from him and left him with three books, not bothering to ask which three books he wanted to keep, and that he never saw the confiscated books again. (*Id.* ¶6.) Other inmates who were searched at that time similarly stated that correctional officers confiscated books and magazines from them and all other inmates in that housing unit, leaving each inmate with no more than three books.[4] (*Id.* at ¶7.)

The policy used to confiscate the excess books found during the search is a formal written policy found in the Inmate Information Handbook (the "Handbook") titled "Items Allowed in Your Cell." (*Id.* at ¶¶15, 16.) The policy limits the amounts of property an inmate may possess in two ways. (Defs.' LR 56.1(a)(3) at ¶2.) First, inmates may possess only certain amounts of individual, numerically-limited items. (*Id.*) For example, inmates may only possess one comb, one bar of soap, four pairs of socks, etc. (*Id.*) Books and reading materials are also limited by this numerical policy. (*Id.* at ¶6.) Specifically, inmates may only possess: "THREE (3) TOTAL-MAGAZINES OR BOOKS PER INMATE (religious material excluded)." (Pl.'s LR

---

[4] Defendants deny that Koger had thirty books taken and that he was not permitted to select which books he wanted to keep. (Defs.' LR 56.1(b)(3)(B) at ¶6.) One of Defendants' witnesses, Sergeant Peter Giunta, the officer in charge of the search team, stated that although he had no personal recollection of the particular search, he did not recall any books or magazines being taken. He claimed that if anything had been confiscated, he would have documented it. (Pl.'s LR 56.1(a)(3) at ¶8.) Defendants also offer as evidence the October 5, 2013 Search Report, which does not indicate any books were taken. (*Id.* at ¶6.) For purposes of this motion, however, Plaintiff's assertion that as many as thirty books were confiscated is taken as true.

56.1(a)(3) at ¶15.) The policy allows CCJ inmates to keep unlimited legal papers, one Bible or Koran, one study book, and three magazines or books, not including religious material. (Defs.' LR 56.1(b)(3)(B) at ¶15; *see also* Defs.' LR 56.1(a)(3) at ¶29.)

The second limitation imposed on inmates and their property is an overall volume limit on all personal items. (Defs.' LR 56.1(a)(3) at ¶2.) Excluding shoes, all other personal property, included numerically-limited items, must fit inside a "property bag," which is about two cubic feet in size. (*Id.* at ¶¶2, 20; *see also* Pl.'s LR 56.1(a)(3) at ¶¶ at 27-29.) If an inmate is in possession of materials in violation of either the numerical limit or volume limit, it is undisputed that the inmate would be considered to possess "contraband." (Pl.'s LR 56.1(a)(3) at ¶17.) The Handbook defines the possession of contraband as an offense that can result in discipline and/or criminal charges. (*Id.* at ¶18.)

There is no temporal limitation on keeping books and magazines in one's cell, and detainees are permitted to discard books and magazines if they have too many, share books and magazines with other detainees, check out up to two books from the library, and receive new books and magazines through the mail or from other sources. (Defs.' LR 56.1(a)(3) at ¶7.)

Defendants' claimed justifications for the three-book policy are: (1) books and magazines can be used to set fires; (2) books can be used as weapons or as makeshift body armor; (3) books can be used to hide weapons or other contraband; (4) books can be used to send coded messages between inmates; (5) books can be

used to jam cell doors or locks; (6) books can be used to cover windows or obstruct officers' view into cells; (7) inmates may have disputes over books; (8) pages from books and magazines can be used to clog toilets; (9) pages from books and magazines can be used to clog or cover ventilation systems; (10) limiting books limits clutter and tripping hazards for detainees and jail personnel; and (11) limiting the number of books and magazines limits the amount of overall property jail staff must search for contraband. (Pl.'s LR 56.1(a)(3) at ¶24.)

**B.    Legal Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("If the non-moving party bears the burden of proof on an issue, . . . that

party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted).

"In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument."); *Knapp v. County of Jefferson*, No. 06 CV 4028, 2007 WL 496396, at *1 (S.D. Ill. Feb. 13, 2007) (denying summary judgment where defendant's brief "contains no facts section and . . . fail[s] to point to the relevant portions of the record to establish the facts of this case").

In addition, "[c]onclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002). Similarly, affidavits or depositions based on speculation, rumor, or conjecture are not sufficient to defeat a properly supported motion for summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d

332, 337 (7th Cir. 1991).  Finally, the Court is "'not required to draw every

conceivable inference from the record,'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th

Cir. 2003) (citation omitted), nor must it "scour the record in search of evidence to

defeat a motion for summary judgment."  *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354

n.4 (7th Cir. 2002) (citation and internal quotation omitted).

C.     **Analysis**

The only issue to be decided in the parties' cross-motions for summary

judgment is whether Plaintiff's First Amendment rights were violated by

Defendants' enforcement of the three-book policy. Plaintiff does not allege any

content-based restrictions, nor does he complain that his Fourteenth Amendment

rights were violated by faulty jail procedures for determining which books to remove

from his cell and/or destroying his property. This Court is not charged with

determining the constitutionality of the policy in the abstract or as applied to

hypothetical future inmates at CCJ. As Judge Easterbrook stated, the case was

remanded to determine what CCJ's book policy was, "how (if at all) it affected

Koger, and if necessary consider the validity of that policy and whether Koger is

entitled to damages." *Lyons*, 901 F.3d at 830.

The Seventh Circuit recently cautioned that "when faced with a First

Amendment challenge . . . brought by an inmate no longer housed at the facility in

question," the trial court should "resolv[e] the case on narrower grounds, focusing

precisely on the case and controversy brought by [the plaintiff]," rather than

making unnecessary constitutional decisions. *See Miller*, 915 F.3d at 464

("[P]rinciples of 'judicial restraint' counsel in favor of resolving 'as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues.'") (quoting *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012)).

With that limited scope of review in mind, the Court turns to the question of whether Plaintiff's First Amendment rights were violated by CCJ's three-book policy when it resulted in the confiscation of thirty books from Plaintiff's cell.

"Freedom of speech is not merely freedom to speak; it is also freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005); *see Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding that the right of freedom of speech "necessarily protects the right to receive" literature). "[I]mprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987)). Nevertheless, prisons are permitted to impose First Amendment restrictions "if they are reasonably related to legitimate penological interests . . . and are not an exaggerated response to such objectives." *Id.* (internal quotations omitted).

The Supreme Court in *Turner* offered four factors a court must consider when determining whether a prison regulation is reasonable:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on

the allocation of prison resources generally? And fourth, are ready alternatives for furthering the governmental interest available?

*Turner*, 482 U.S. at 93; *see also Beard*, 548 U.S. at 533 ("The real task . . . is not balancing these factors, but rather determining whether the [Defendant] shows more than simply a logical relation, that is, whether he shows a *reasonable* relation.") (emphasis in original).

Although the burden of persuasion always remains on the prisoner challenging a regulation, "defendants must still articulate their legitimate governmental interest in the regulation." *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011); *see Beard*, 548 U.S. at 536 ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective. A prisoner may be able to marshal substantial evidence that, given the importance of the interest, the Policy is not a reasonable one."). Nevertheless, "[c]ourts are to accord 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.'" *Van den Bosch*, 658 F.3d at 786 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

### 1.    *Legitimate Governmental Interest*

"[A]nalysis under this factor requires consideration of 'whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective.'" *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1159 (N.D. Ill. 2013) (citation omitted). Plaintiff places Defendant's

various rationales for the three-book policy into three categories: (1) safety and security (using books to start fires, conceal contraband, send messages, jam cell doors, or as weapons or body armor; theft and disputes over books); (2) sanitation (using books to clog toilets or block vents; cluttering cells); and (3) administrative convenience (limiting the amount of property that must be searched), and then argues that none of these reasons is rationally related to a legitimate penological interest.

a.    <u>Presence of other materials that pose identical risks</u>

According to Plaintiff, the availability of other paper materials in cells, such as paper bags, toilet paper, legal papers, religious texts, writing pads, envelopes, greeting cards, and playing cards, undermines the validity of Defendant's claim that the paper composition of books poses a safety or sanitation threat. Plaintiff maintains that a numerical limit on books is not rationally related to a penological interest, given that inmates are also limited to keeping only that which will fit into a property bag. Defendant counters that the mere fact that prisoners have access to some materials with the potential for misuse does not mean they have to allow inmates access to even more such materials.

The Court agrees that the mere availability of other materials made of paper does not demonstrate the three-book policy is unjustified. Plaintiff has not established that once a jail allows certain items that may pose risks into cells, the facility has waived the right to restrict other such items in any way.

The nature of books implicates a number of different penological concerns across different categories. Thus, Plaintiff's efforts to equate books with other items made of paper are misplaced. Unlike writing paper and playing cards, books can be hollowed out and used to secrete contraband, and because they are bound, they can be fashioned into stronger weapons or body armor than can other paper products. Plaintiff has failed to show that these are not legitimate institutional problems. *See Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (holding that the legitimacy of regulations relating to prison security is "beyond question," because security is "'central to all other corrections goals'") (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)).

Moreover, if CCJ limited possession of the other paper materials described by Plaintiff – such as articles needed for hygiene and comfort, legal and religious texts, and paper necessary for communication – that would implicate greater constitutional concerns. Defendant's decision to instead limit the amount of paper in cells by placing a numerical restriction on books read for pleasure is therefore not unreasonable. *See Munson*, 673 F.3d at 637 ("Allowing reduced access does not mean that barring unfettered access is illegitimate, even if restricted access creates an appearance of inconsistency."). "[T]he deference we afford prisons permits such seeming inconsistencies." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (upholding a policy of censoring magazine pages about prison riots while allowing access to writings and television shows describing the same topic).

b.    <u>Other comparable institutions impose no such restriction</u>

Plaintiff cites to policies of several institutions under the umbrella of the Illinois Department of Corrections as well as those administered by the Federal Bureau of Prisons that do not impose numerical limits on books. He notes that Defendant's expert witnesses acknowledged that the three-book plus property box limit policy is an outlier, and that federal facilities generally impose either a numerical limit or a total volume limit, but not both. Moreover, the DOJ monitor overseeing health and safety matter in CCJ from 2010 to 2017 endorsed the use of the property bag as a means to control the volume of personal property in cells and did not recommend imposing a numerical restriction on books. However, the fact that other institutions have chosen to address these concerns in other ways does not by itself show that the three-book policy is unreasonable.

c.    <u>Lax enforcement of the policy</u>

CCJ administrators have acknowledged that enforcement of the three-book policy is lax, and the decision whether to strictly enforce it is an issue left to the discretion of jail personnel, including division superintendents and shift supervisors. Plaintiff contends that if the stated rationales for the three-book policy were true, enforcement would be more stringent.

Defendant responds that while CCJ has been subject to federal monitoring, the jail has been more strictly enforcing the limits in the Inmate Information Handbook. Any lax enforcement has operated as a behavioral management tool, *i.e.*, a privilege given as a reward for following rules. Plaintiff acknowledges that CCJ's

lax enforcement policy is driven in part as a means to "'placate' the most 'dangerous' inmates and to focus on 'more important things, more risks as – security and safety risks.'" (Pl.'s Mot. at 6). Plaintiff contends, however, that this rationale undermines the three-book policy's logic, because if the limit is truly intended to reduce hazards and disruptions, it is illogical to relax the rule for high-risk inmates.

Plaintiff's suggestion that selective enforcement of the rule negates any penological interest is unpersuasive. As Defendant analogizes, selective enforcement of speed limits does not mean there is no rational public interest in reducing highway speed. Furthermore, "providing increased incentives for better prison behavior" is by itself a valid justification for allowing prisoners to retain varying amounts of reading materials. *See Beard*, 548 U.S. at 530.

### d. Policy won't achieve stated objectives

Plaintiff argues that Defendant has failed to offer sufficient evidence to support the notion that security and sanitation concerns justify the three-book policy, or that the policy has made CCJ more secure and less prone to fires. According to Plaintiff, CCJ's records demonstrate that reading materials have rarely been used to fuel fires and have not caused any serious problems. The Court, however, cannot conclude that the absence of safety problems while the policy is in effect demonstrates that the policy is unnecessary, even though the policy may have been inconsistently enforced.

e.     Based only on abstract logic

Plaintiff believes that Defendant's policy is based solely on the theory that more paper equals more problems, rather than any concrete facts. He claims that there is no factual basis to believe that books cause any hazards other than some "squabbling" among inmates. (Pl.'s Mot. at 24.) However, the issue is not whether the perceived threats actually resulted in harm, but instead "whether plaintiff has shown that it was not reasonable for defendants to perceive the [banned publication] as a potential threat to rehabilitation and security." *Van den Bosch*, 658 F.3d at 788. Plaintiff has not done so here.

## 2.     *Alternative Means of Exercising the Right*

"Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (quotations, alterations, and citations omitted). Plaintiff contends that the three-book policy does not allow adequate alternative means for exercising his First Amendment right to read, as it severely limits "inmates' ability to freely read non-religious materials," (Pl.'s Mot. at 24), due to the number of hours they are restricted to their cells. For example, Plaintiff was in CCJ for ninety days and in that time, "he read forty-six books, six to eight issues of *The New Yorker* magazine, and a few comic books." (Pl.'s Mot. at 24.) Plaintiff also complains that the policy made it a practical impossibility for him to keep a book containing an inscription from a friend, because that book was confiscated.

Defendant maintains that inmates' First Amendment rights are adequately protected because the jail's policy allows them access to a wide variety of reading materials, including one study book and an unlimited number of legal and religious materials, as well as the ability to rotate out the three other books every day.

This factor strongly weighs against Plaintiff. There is no suggestion that the existence of the policy limited Plaintiff's rights in any demonstrable way. By Plaintiff's own account, he was allowed to read an average of more than two books or magazines every single day he was incarcerated at CCJ, and he does not contend the content of the books was unconstitutionally restricted. The Court therefore cannot conclude on this record that Plaintiff's First Amendment right to read was thwarted. *See Thornburgh*, 490 U.S. at 417-18 ("'[T]he right' in question must be viewed sensibly and expansively. . . . As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied."); *see also Tarpley v. Allen County*, 312 F.3d 895, 899 (7th Cir. 2002) (upholding jail regulation forbidding inmates from retaining any personally owned reading materials); *cf. King*, 415 F.3d at 638 ("Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect.").

### 3. *Existence of Alternatives/Impact of Accommodation on Others*

"[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. . . . By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated

response' to prison concerns. . . . [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 90 (citation omitted).

Plaintiff emphasizes that he is not claiming a right to an unlimited number of books, but rather that he should have been allowed to have as many books or magazines as would fit into his property bag along with any other possessions required to be stored there. Plaintiff asserts that the volume restriction is an obvious, easy alternative to the numerical restriction on books which would have been simple for jail personnel to monitor.

Defendant counters that removing the numerical restriction would add a significant burden on CCJ staff because it would increase security and safety risks. The physical amount of property is not the jail administrators' only concern, and thus it is not enough for a guard to visually determine that an inmate's property is all contained within the bag. The possibility of contraband and passed messages means that books must be individually searched page by page, a process that is more time-consuming than inspecting other forms of property. A numerical restriction lessens the burden of conducting this type of inspection.

In addition, Defendant maintains that Plaintiff's suggested alternative of a volume restriction is actually CCJ's policy as practiced, since inmates are allowed more than three total books as a behavior management tool. That behavior

incentive would be removed if as a matter of course inmates were allowed an unlimited number of books as long as they fit into the property bag.

Defendant has sufficiently shown that it has reasonably rejected the alternate of a volume restriction for reasons of safety and administrate convenience. "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Thornburgh*, 490 U.S. at 419 ("[T]he administrative inconvenience of this proposed alternative is also a factor to be considered . . .").

The Court notes Plaintiff's implicit admission that a volume-based policy would be constitutional. However, there is no argument or evidence in the record establishing that the thirty-plus books Plaintiff claims were unlawfully seized would have fit into his property bag. Thus, this alternative would not have addressed his claims that his books were unconstitutionally confiscated.

Because Plaintiff has failed to show that the three-book policy is not reasonably related to CCJ's legitimate penological interests, Defendants' motion for summary judgment must be granted, and Plaintiff's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration of Denial of Plaintiff's Motion for Summary Judgment [Doc. No. 175] is granted, and the Court's prior order [Doc. No. 171] is vacated. Plaintiff's Motion for Summary Judgment [Doc. No. 115] is denied, and Defendants' Motion for Summary Judgment [Doc. No. 118] is granted.

**SO ORDERED.**                                      **ENTERED:**

**DATE:    September 9, 2019**              _____
                                            **HON. MARIA VALDEZ**
                                            **United States Magistrate Judge**