IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN OROZCO, as administrator of the estate of Gregory Koger, | ) ) ) | |
| Plaintiff, | ) ) | No. 14 C 6361 |
| v. | ) ) | Hon. Maria Valdez |
| | ) ) | |
| THOMAS J. DART, et al., | ) ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 1

I.    Gregory Koger Had a Property Interest in his Confiscated Books ............. 1

II.   Due Process Is Not Satisfied Simply Because Koger Knew Excess Books Were Deemed to be Contraband and Could Have Discarded Excess Books Prior to their Being Confiscated by Jail Officials ................. 6

III.  Contrary to Defendants' Assertions, Plaintiff Is Not Making a Widespread Practice Claim ........................................................................... 9

IV.  Defendants' Written Policies Are Inadequate .............................................. 13

     A.  Koger Was Injured By Defendants' Policy ............................................. 14

     B.  The Jail's Failure to Have an Adequate Policy Was the Moving Force Behind the Alleged Deprivation of Constitutional Rights ................................................................................ 16

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**Case Law**

*Anderson v. Fiedler*, 798 F. Supp. 544 (E.D. Wis. 1992)..................................5-6

*Baker v. Piggott*, 833 F.2d 1539 (11th Cir. 1987) ...............................................5

*Bd. of County Comm'rs. of Bryan County v. Brown*, 520 U.S. 397 (1997) ........16

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .............................................10

*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) .............................9, 17

*Harris v. Forsyth*, 735 F.2d 1235 (5th Cir. 1984)..............................................5-6

*Koger v. Dart,* 950 F.3d 971 (7th Cir. 2020) ......................................................*passim*

*LeBourgeois v. Wolf*, 2020 U.S. Dist. LEXIS 41071
   (E.D. Wis. March 10, 2020) ..........................................................................5

*Lyons v. Dart,* 901 F.3d 828 (7th Cir. 2018) ......................................................7, 9

*Robles v. City of Fort Wayne*, 113 F.3d 732 (7th Cir. 1997)..............................11

*Streckenbach v. Van Densen*, No. 15-CV-451, 2016 U.S. Dist. LEXIS 36994
   (E.D. Wis. Mar. 21, 2016) ............................................................................8

*Streckenbach v. Van Densen*, 868 F.3d 594 (7th Cir. 2017).............................8-9

*Taylor v. City of Chi.*, No. 13 CV 4597, 2020 U.S. Dist. LEXIS 2604
   (N.D. Ill. Jan. 8, 2020) ................................................................................10

*United States v. Miller*, 588 F.3d 418 (7th Cir. 2009).......................................3-5

*Vasquez v. Will Cty. Sheriff's Office*, No. 18 C 3137,
   2019 U.S. Dist. LEXIS 150629, (N.D. Ill. Sep. 4, 2019)............................16

*Zinermon v. Burch*, 494 U.S. 113 (1990) ..........................................................11

## INTRODUCTION

Defendants' response/cross-motion for summary judgment ignores two important and interrelated principles enunciated by the Seventh Circuit in this case: (1) a prisoner may lose a possessory interest in belongings deemed to be contraband by jail officials, but he retains a property interest in those belongings; and (2) while it is permissible for a jail to limit the number of books an inmate may possess in his cell, it does not follow that guards are free to dispose of any books in excess of that limit. A fair and full reading of the Seventh Circuit decisions forecloses Defendants' main arguments. But instead of addressing the Seventh Circuit's decision, Defendants' strategy is to misrepresent the nature of Plaintiff's claim; produce evidence that has nothing to do with the issues at hand; make arguments that are at odds with the Seventh Circuit's decision; and misrepresent relevant case law.

## ARGUMENT

### I. Gregory Koger Had a Property Interest in his Confiscated Books

Defendants' first argument is that inmates do not have a property interest in materials, including personal property, deemed by the jail to be contraband and thus principles of due process do not even come into play in this case. Def. Br. at 1 ("Plaintiff never had any property interest in contraband, so any taking and destruction of that contraband would not violate the Due Process Clause."); *see also, id*. at 8-15. Defendants' argument is wrong as a matter of law. It is based on a fundamentally false premise—namely, that an inmate retains no property interest in items deemed to be contraband by jail officials.

In *Koger v. Dart,* 950 F.3d 971 (7th Cir. 2020), the Court made clear that there is a distinction between a possessory interest and a property interest. To be sure, Plaintiff Koger lost his possessory interest in his books by having more than three books in his cell in violation of the jail's three-book policy, but he did not lose his property interest in the confiscated books. *See id.* at 975 ("What was true of Miller is true of Koger too: he lost a possessory interest in the books by keeping too many in his cell, but he did not automatically lose his property interest."); *see also id.* at 975 ("We have seen before, and rejected, an argument that items deemed contraband only because found in the wrong hands may be summarily destroyed.").

The possessory/property distinction is key to the Seventh Circuit's decision to remand the case, but nowhere do Defendants acknowledge this distinction. Defendants' failure to own up to this critical distinction leads to, among other things, their repeatedly misstating the Seventh Circuit's holding, asserting that the Court held the jail's policy regarding books to be "constitutional." *See* Def. Br. at 1 ("The Seventh Circuit affirmed this Court's ruling that CCJ's 'three book policy' is constitutional."); *id.* at 8 ("The Seventh Circuit held that CCJ's three book policy is constitutional"); *id.* at 12 ("As the Seventh Circuit held, CCJ's three book policy is Constitutional."); *id.* at 19 ("The Seventh Circuit already held that CCJ's three book policy is Constitutional.").

In fact, the Seventh Circuit upheld the jail's three-book policy *only* as concerns the jail's ability to restrict inmates to retaining a maximum of three books in their cells; the Court did not uphold the right of the jail to discard books that are

2

confiscated from inmates pursuant to that restriction. As the Seventh Circuit stated, "*Excess* books may be a kind of contraband, but only while in the cell." *Id*. at 976 (emphasis in original). Simply stated, this distinction is lost on Defendants, and as a consequence Defendants' argument that Plaintiff did not retain a property interest in his confiscated books is made in defiance of the Seventh Circuit's decision.

Logically speaking, if, as Defendants contend, defining excess books as "contraband" is enough to eliminate Plaintiff's property interest in his books, the Seventh Circuit wouldn't have remanded this case for consideration of the due process claim. This is so because the Seventh Circuit understood full well that the jail defined excess books as contraband, and yet the Court explained that "*call[ing]* something contraband does not make it so." *Id*. at 975 (emphasis in original).

Based on the above analysis, the futility of Defendants' argument should be clear, but for the sake of completeness Plaintiff will address Defendants' efforts to distinguish *United States v. Miller*, 588 F.3d 418 (7th Cir. 2009). *See* Def. Br. at 11-12. *Miller* is a case on which the Seventh Circuit relied for the proposition that there is a distinction between possessory and property interests. *See Koger* 950 F.3d at 975-76.

In *Miller*, the Seventh Circuit held that federal agents deprived Leroy Miller of his property without due process when they seized and destroyed 34 firearms from him. *Miller*, 588 F.3d at 418. The government argued that its destruction of the guns was proper because "Miller's felony conviction prevents him from possessing

3

the weapons and makes their return unlawful." *Id.* at 418-20. The Seventh Circuit found that—notwithstanding Mr. Miller's legal incapacity to lawfully possess the guns—he retained a property interest in the guns of which he could not be deprived without just compensation. The Court wrote as follows:

> Miller's property interest in the firearms continues even though his possessory interest has been curtailed. If the United States does not want to sell them for his account, then it must offer Miller some other lawful option: having a trustee sell or hold the guns, or giving them to someone who can be relied on to treat them as his own.

*Id.* at 420.

As the Seventh Circuit explained, "What was true of Miller is true of Koger too: he lost a possessory interest in the books by keeping too many in his cell, but he did not automatically lose his property interest." *Koger*, 950 F.3d at 975.

Defendants argue that *Miller* is distinguishable because the books at issue were always contraband as soon as Koger had more than three books in his cell, whereas Miller was not always prohibited from possessing firearms. Def. Br. at 11 ("there was a time that Miller, with a clean record and living on a farm, lawfully owned and possessed the 34 firearms."). But this distinction is meritless for at least two reasons. One, the Seventh Circuit put no stock in it; and two, Koger, just like Miller, could regain the lawful ability to possess the seized property if his circumstances changed. *See Miller*, 588 F.3d at 420 ("Miller's inability to possess firearms lasts only as long as his conviction. A pardon thus would end the disability.") Indeed, upon his release from the Cook County Jail three weeks after the seizure and destruction of his books, it would have been perfectly legal for Koger to have as

4

many books as he wants. *See* Plf. SOF at ¶¶1, 5, 6 (explaining that books were seized on October 5, 2013 and Koger was released from Cook County Jail on October 24, 2013). Thus, as the Seventh Circuit observed, *Miller* is directly on point.

Finally, in support of their argument that an inmate does not have a property interest in his confiscated books, Defendants misrepresent applicable case law. In particular, Defendants cite *LeBourgeois v. Wolf*, 2020 U.S. Dist. LEXIS 41071 at *14-15 (E.D. Wis. March 10, 2020) as holding that "prisoners have no protected property interest in [items deemed contraband] in jail," including books. *See* Def. Br. at 14, n.9. But, contrary to Defendants' assertions, *LeBourgeois* supports Plaintiff's position. The district court in *LeBourgeois* found that a prison was authorized to seize a prisoner's contraband books, food and other items, but recognized that "an inmate is entitled to some amount of process after the property is seized but before it is destroyed" and cited to the Wisconsin Department of Corrections policy that allows prisoners to contest the seizure of their property. 2020 U.S. Dist. LEXIS 41071, *15.

The other cases Defendants rely on for their claim that anything a jail deems to be "contraband" can be summarily destroyed are not persuasive here for several reasons. One, they are all decades old and came well before the Seventh Circuit's decision here. *See* Def. Br. at 8 (*citing Anderson v. Fiedler*, 798 F. Supp. 544 (E.D. Wis. 1992); *Baker v. Piggott*, 833 F.2d 1539 (11th Cir. 1987); and *Harris v. Forsyth*, 735 F.2d 1235 (5th Cir. 1984)). Two, these cases are distinguishable because in each case the issue was the seizure of currency that was in an inmate's possession, and

5

in each instance there was a statute or written administrative rule governing precisely how unauthorized currency would be handled. *See Anderson*, 798 F. Supp. at 547 (noting that the Wisconsin administrative code provides that all currency seized from prisoners will be "deposited in the state's general fund."); *Harris*, 735 F.2d at 1236 (noting that a state statute made it clear that any currency "found on or in the possession of an inmate will be confiscated and deposited in the inmate welfare fund.") Here, in contrast, the jail has no written policy setting forth what is done with property seized from inmates, which Judge Easterbrook observed during oral argument amounts to "a policy to let the guards do what they want." *See* Oral Argument at 19:20 – 19:34.[1]

## II. Due Process Is Not Satisfied Simply Because Koger Knew Excess Books Were Deemed to be Contraband and Could Have Discarded Excess Books Prior to their Being Confiscated by Jail Officials

Next Defendants argue that "[e]ven if Plaintiff did have a protected property interest in contraband, Plaintiff received all the process he was due." Def. Br. at 15. Defendants' argument is that sometime prior to the October 5, 2013 search that resulted in the loss of his 30-plus books, Plaintiff was told that "a search was coming, and that he should address his excess property, specifically including his excess books," and, given this, "Plaintiff had notice of the rule, and was given the chance to send excess books to friends or family" and thus "[a]s a matter of law, Plaintiff received all the process he was due." Def. Br. at 17. This argument is

---

[1] The Oral argument recording is available at: http://media.ca7.uscourts.gov/sound/2018/rt.17-3170.17-3170_05_17_2018.mp3

6

without merit for two main reasons.

First, in so arguing, Defendants misconstrue the due process interest at stake. This case is about the requisite process due to Plaintiff *after* his books were confiscated, not before. *See Koger v. Dart,* 950 F.3d at 974 ("Although the three-book policy is valid, it does not follow that guards are free to throw confiscated books on a bonfire or otherwise dispose of them."); *id.* at 976 ("[T]he district court will need to decide what choices, if any, were offered to Koger when the guards discovered the excess books and what became of them."); *see also Lyons v. Dart,* 901 F.3d 828, 830 (7th Cir. 2018) ("But it would be premature for us to address the merits while it remains unclear just what policy the Jail has adopted for dealing with confiscated reading matter.") In support of the argument, Defendants have produced affidavits of three jail employees establishing that a process exists at the jail whereby inmates are able to send personal property to friends and family pre-confiscation (*see* Def. Br. at 8, 16 and Def. Exhibits B, C and D), but none of this evidence and argument is relevant to the issue at hand, which is Plaintiff's and other inmates' ability to protect their property interest post-confiscation by jail officials.

Second, the argument is at bottom an argument for the *status quo* and, as such, conflicts with the Seventh Circuit's holding—namely, that inmates retain a property interest in their confiscated books and other legal property. That is, Defendant's argument is not just that Koger in the particular circumstances of this case had fair notice that his books were to be confiscated and discarded. No, the logic of Defendants' argument leads to the inescapable conclusion that whenever jail

7

officials confiscate excess books inmates will have fair notice that the books will be discarded. For as admitted by the Defendants, all inmates have notice that books in excess of three are deemed to be contraband. *See* Def. Br. at 3 ("CCJ's policy limiting the number of books and magazines that detainees may keep, and defining any excess as contraband, is set forth in the Handbook, which every detainee receives upon arrival at CCJ."). Moreover, searches occur on a regular basis and inmates know this too. *See* Def. Br. at 8 ("every living unit in the entire jail is routinely searched every week or two, meaning there are thousands of tier searches every year.")

So there was nothing special about the seizure and destruction of Plaintiffs' books. And if all that is required to satisfy due process is notice that books in excess of three will be deemed contraband and discarded, then there would be no due process problem with the jail's current policy.[2]

---

[2] It should also be noted that it is far from clear that Koger and other detainees whose books were seized on October 5, 2013, actually received fair notice that their books were going to be taken and an opportunity to avoid that outcome. First, the undisputed evidence makes clear that the inmates whose books were seized had good reason to believe that their books would not actually be confiscated. Defendants admit that the three-book limitation was only sporadically enforced. *See* Def. Resp. to Plaintiff's SOF at ¶15, 17 (admitting that the "the express limits found in the policy are not strictly enforced."); *See also* Def. SOF at ¶¶29-33 (citing testimony from witnesses that the three-book limitation was rarely enforced and that detainees often had more than three books). Based on this experience, it was reasonable for Koger and other detainees to assume that they would be permitted to keep more than three books. Second, in the prison context, due process requires "notice and an adequate opportunity to comply." *Streckenbach v. Van Densen*, No. 15-CV-451, 2016 U.S. Dist. LEXIS 36994, at *9 (E.D. Wis. Mar. 21, 2016). As a practical matter, Koger didn't have a realistic opportunity to send his books elsewhere prior to the Defendants' seizure and destruction of them. At best he was given "a couple of days" notice. *See* Plf. Resp. to Def. SOF at ¶14 (citing testimony of Koger). Two or three days wasn't a reasonable opportunity to find out if a friend would be willing to pick up and/or hold onto his property for him, find out the address to which to direct his books, and obtain mailing materials and postage. *Compare Streckenbach v. Van Densen*, 868 F.3d 594, 596 (7th Cir. 2017) (upholding

8

## III. Contrary to Defendants' Assertions, Plaintiff Is Not Making a Widespread Practice Claim

Next Defendants argue that "Plaintiff… can only succeed if he can show…a widespread practice or custom led to the permanent loss of his books" (Def. Br. at 18) and that Plaintiff has "fail[ed] to carry his burden to show…there was [such] a widespread practice." *Id*. at 21-22. *See* full argument at 18-23. This argument is pure misdirection. Plaintiff's alleged failure to make out a widespread practice claim is for naught because Plaintiff is not making a widespread practice claim but an express policy claim. This is made clear throughout Plaintiff's briefing.

In Plaintiff's opening brief, Plaintiff argues that, while "[t]he overwhelming evidence in this case indicates that … the standard practice was to discard the confiscated books and magazines" (*see* Plf. Br. at 14), Plaintiff's claim is not that the jail mandates that guards discard inmates' property, but that the jail leaves the door open for them to do so, and that the "absence of any policy amounts to a policy." *See* Plf. Br. at 21.³ Obviously, given that Plaintiff makes an express policy claim, Defendants' argument that Plaintiff has failed to prove a sufficient number of

---

policy whereby prisoner's property "had to be collected … [or] ship[ped] to someone the inmate had designated … within 30 days.")

³ In *Lyons v. Dart,* 901 F.3d 828 (7th Cir. 2018), the Court also identified that Plaintiff challenges the Jail's express policy. *Lyons* at 830 ("Koger challenges the Jail's policy, and given the nature of that policy (as Koger describes it), some form of pre-deprivation process—such as asking a prisoner to designate what should be done with the excess books—would have been practical."). As Judge Easterbrook observed during oral argument, the absence of any policy amounts to "a policy to let the guards do what they want" with the books they confiscate. *See* Oral Argument at 19:20 – 19:34; *see also id*. at 16:57–17:36 ("They can take them home and read them themselves; they can throw them on a bonfire; they can launch them into orbit. The sheriff has chosen to let the guards do what they want.") *See also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 383 (7th Cir. 2017) ("[A] policy not to have a policy" is a policy) (Sykes, J. dissenting).

9

incidents to establish a widespread practice claim (*see* Def. Br. at 18-19) falls by wayside, since in an express policy claim one incident is enough. *See Taylor v. City of Chi.*, No. 13 CV 4597, 2020 U.S. Dist. LEXIS 2604, at *8-9 (N.D. Ill. Jan. 8, 2020) ("[E]vidence of one incident [is] enough to justify the requisite inferences of culpability and causation[] where a constitutional violation is a 'highly predictable consequence' of the policy omission.") (*citing Calhoun v. Ramsey*, 408 F.3d 375, 379-81 (7th Cir. 2005)).

Here, Defendant admits that the jail has no written policy concerning what is done with books that are seized from inmates. *See* Def. Resp. to Plf. SOF at ¶19 (admitting that it was "not written down anywhere" that guards are supposed to give detainees the ability to mail books home). Moreover, the jail has admitted that jail officials have discretion to decide what is done with confiscated materials, and that various supervisory officials enforce the policy differently. *See e.g.*, Plf. SOF at ¶19 (Moreci's testimony that confiscated books are "most likely destroyed, thrown in the garbage."); Def. Resp. to Plf. SOF at ¶19 (citing Scott Kurtovich's testimony that officials can "remove" excess property, "or have the ability to have [the detainee] send that excess stuff home."); *id.* (citing Giunta's testimony that he typically allows detainees to send excess books home); *id.* at ¶17 (undisputed that "[w]hether and how strictly to enforce the three-book/magazine policy is left up to the discretion of jail personnel, including division superintendents and shift supervisors.").

Here, the relevant legal question is whether the failure to have a policy subjects Defendants to liability. In answering this question, Defendants misstate the law

10

concerning when a gap in a policy subjects an entity to liability, claiming "A gap in policies claim requires a showing that 'an unlawful practice was so pervasive or systemic that policy-making officials knew of its existence and that their acquiescence to the ongoing practice amounted to a policy decision.'" *See* Def. Br. at 23-24. In fact, as Plaintiff set forth in his opening brief, an entity is liable for failure to implement a policy where, as here, it is predictable and foreseeable that such a policy is necessary and where it was not impossible or unduly burdensome to implement such a policy. *See* Plf. Br. at 21-22.

Here, the need for a policy was obvious because the jail gave its officials the power to confiscate books pursuant to the three-book policy, which created an obvious need for policies to protect inmates' property interest in the confiscated property. *See* Plf. Br. at 9, fn. 4 (*citing Zinermon v. Burch*, 494 U.S. 113 (1990) ("Florida chose to delegate to petitioners a broad power to admit patients to FSH, *i.e.*, to effect what, in the absence of informed consent, is a substantial deprivation of liberty. Because petitioners had state authority to deprive persons of liberty, the Constitution imposed on them the State's concomitant duty to see that no deprivation occurs without adequate procedural protections."); *see also, Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) ("A municipality would evince a deliberate indifference to the constitutional rights of its citizens by failing to train its employees with respect to a clear constitutional duty implicated in recurrent

11

situations that a particular employee is certain to face.")[4] Defendants do not make any argument countering this point.

In addition to the meritless argument that Plaintiff must establish a "widespread practice" to hold Sheriff Dart liable, Defendants make the equally misdirected argument that Plaintiff has not made a valid express policy claim, asserting that "In the case at bar, Plaintiff has not pointed to an official policy authorizing the destruction of his books, nor has he claimed a person with final policy-making authority, *i.e.* Sheriff Dart, personally had any role in destroying his books." Def. Br. at 18. This argument badly misconstrues the law. It is not necessary to allege or prove that the Sheriff directly authorized destruction of Plaintiff's books. As explained above, it is enough that the jail failed to implement a policy under circumstances where the need for a policy was obvious and which resulted in the denial of plaintiff's due process rights.

Finally, in arguing that Plaintiff has failed to establish either a widespread practice or express policy, Defendants seek to downplay the testimony of their 30(b)(6) witness Director Daniel Moreci. Director Moreci testified that books and magazines seized from detainees are "most likely destroyed, thrown in the garbage." SOF ¶19. *See* Def. Br. at 20-21. The Sheriff insists that, when Director Moreci said this, he was not actually testifying to enforcement of the three-book policy but he

---

[4] Here, the jail's policies and practices (*e.g.*, their sporadic enforcement of the three-book limit) made it a virtual certainty that jail personnel would come into contact every day with individuals who had more than three books in their cells. *See*, *e.g.*, ECF 232-5 at 88 (Director Moreci's testimony that he would guess "95 percent" of detainees at the jail have more than three books). This makes it obvious that corrections officers would be forced to decide what to do with the books.

12

was only testifying to situations where books were confiscated due to "[c]lutter, unsanitary conditions, contraband being found, security concerns." *Id*. at 20. But this is a distinction without a difference. Defendants do not dispute that "whether and how strictly to enforce the three-book/magazine policy is left up to the discretion of jail personnel, including division superintendents and shift supervisors." Def. Resp. to Plf. SOF at ¶17. And all of their witnesses, including Director Moreci, testified that supervisors within the jail had discretion to decide whether excess books should be confiscated, based in part on their own perceptions of "cleanliness." *Id*.[5] Thus, there is no basis for Defendants' argument that Director Moreci's testimony that confiscated books are "most likely destroyed, thrown in the garbage" was limited to special circumstances other than enforcement of the three-book rule.

## IV. Defendants' Written Policies Are Inadequate

Finally, Defendants argue that the Cook County Jail has "appropriate written directives." Def. Br. at 23-25. As explained in Section III above, Defendants do not dispute that they have no written policy pertaining to what happens to personal property that is confiscated from inmates, leaving it to correctional officials to decide how to dispose of confiscated property. Defendants nonetheless contend that

---

[5] *See* Def. Resp. to Plf. SOF at ¶17 (Moreci's testimony that "if a particular supervisor believes it's important to enforce the three-book policy, they have the authority to do that."); *id.* (Sgt. Giunta's testimony that "it depends on the individual supervisor whether the rule is going to be enforced"); *id.* (Chief Schroer's testimony that "[i]t depends on the … superintendent in the division is and how much of a stickler they are for cleanliness," whether the three-book limit is enforced); Plf. Resp. to Def. SOF at ¶39 (Moreci's testimony that it's "up to the discretion of the individuals working in a given housing unit" whether to enforce the [three-book] rule" taking into account "clutter" and "sanitation issues").

13

their policies are adequate without offering any real analysis or defense of their written policies. *Id.* Plaintiff does not repeat his arguments regarding the deficiencies in the jail's written policies here, but only responds to Defendants' two arguments against liability for their failure to implement a written policy—(1) that Plaintiff has not established an injury resulting from the jail's policy; and (2) that Plaintiff has not shown a causal relationship between the policy and his injury.

### A. Koger Was Injured By Defendants' Policy

In order for Plaintiff to have a valid legal claim, he had to have suffered a harm. *See Koger*, 950 F.3d at 976 (Even "a bad policy would not lead to damages if it did not injure Koger.") Defendants assert that there is no proof Plaintiff suffered any injury here. Def. Br. at 23. ("Plaintiff has offered no evidence to meet his burden and show that there was a widespread practice [that] … caused Plaintiff any injury.") To the contrary, there is extensive testimony showing that Plaintiff never got his books back (SOF at ¶6); nor did others whose books were also confiscated. *See* SOF at ¶7 (The testimony of five other inmates whose books were confiscated at the same time, all of whom testified that they never saw their books again). This testimony is ignored by Defendants.[6]

---

[6] In addition, Defendants argue that any harm Plaintiff suffered was of his own making. *See* Def. Br. at 19, fn.10 ("Plaintiff did not have to lose any books had he merely been willing to speak to officers or engage in some kind of follow-up after the alleged taking.") Defendants' argument is based on the declaration of Kevin Long who testified that he was able to recover several of his confiscated books after the same October 5, 2013 search. Defendant argues that, similar to Long, Plaintiff Koger could also have obtained his confiscated books if he had simply asked the correctional officers to return them. The idea doesn't square with Mr. Long's testimony. Long testified that it was through the good graces of one correctional officer who escorted him and another inmate to the confiscated books and opted to look the other way to allow Mr. Long to rummage through several large

14

To be sure, Defendants do dispute that any books were taken, but there is no legitimate evidentiary basis for such a dispute. *See* Def. Resp. to Plf. SOF at ¶8; Plf. Resp. to Def. SOF at ¶22. In particular, Defendants' citations for this alleged dispute are to Sgt. Giunta's testimony. But it was Giunta's testimony that he did not recall the search at all. *See* Plf. Resp. to Def. SOF at ¶22. Sgt. Giunta testified as follows:

> Q: Let's talk a little bit about what happened on October 5, 2013. … [O]ne of the things that has come up in this case is that there was a search of certain tiers within Division Ten that day. Do you recall that incident at all?
> A: No.

*Id.* Based on this, it is far-fetched to argue that there is a legitimate factual dispute that Plaintiff's books were taken.[7] There isn't a genuine issue of fact for submission to the jury about whether Plaintiff suffered harm.[8]

---

garbage bags in an attempt to find a few of his books. *See* Def. SOF at ¶38. Despite this highly unusual assistance, Mr. Long wasn't able to get all of his books back, and there is no suggestion that Plaintiff or anybody else was accorded the same opportunity to get their confiscated books back. *See* Plf. SOF at ¶7.

[7] Defendants also reference the Search Report for the October 5, 2013 search, which reflects that a search of Deck 3A was conducted on October 5, 2013, and jail personnel removed "all garbage and extra linen and uniforms." Def. Resp. to Plf. SOF at ¶8. Defendants claim this means that "no books were taken." *Id*. But the fact that the search report does not explicitly reference books is far from definitive evidence that none were taken. Indeed, Sgt. Giunta testified that it "appears … that something was erased or whited out" on the Search Report, but he had no idea what was written there that was later erased. *See* Plf. Resp. to Def. SOF at ¶22 (*citing* ECF 232-3, Dep. of Giunta, at 25:9-15).

[8] Nevertheless, if the court finds that there is a dispute of fact regarding whether books were taken from Koger, this court should still decide as a matter of law whether the jail's written policies (about which there are no factual disputes) are constitutional.

15

## B. The Jail's Failure to Have an Adequate Policy Was the Moving Force Behind the Alleged Deprivation of Constitutional Rights

In order for the Sheriff to be liable for having a constitutionally inadequate policy, the failure to have an adequate policy must be the moving force behind the alleged deprivation of constitutional rights. *Bd. of County Comm'rs. of Bryan County v. Brown*, 520 U.S. 397, 403-404 (1997). Here, Defendants argue that there was no causal connection between the jail's failure to have a policy and the loss of Koger's books: "Plaintiff has no evidence that that [the failure to have an adequate policy] was [the] *moving force* behind his alleged deprivation." (Def. Br. at 22); *see also id.* at 24 ("Plaintiff has offered no evidence that the lack of a written policy for officers 'caused' his loss of books.") In fact, the causal nexus here could not be clearer: if the jail had a written policy to guide correctional officers' disposition of confiscated books, correctional officers could and would be reasonably expected to follow that policy, thereby eliminating the risk of correctional officers' disregarding those interests, as alleged here. It stretches logic to think that there is no causal relationship between a lack of policy and the destruction of Plaintiff's personal property: the complete lack of policy here opened the door to the correctional officers' discarding Plaintiff's books. *See Vasquez v. Will Cty. Sheriff's Office*, No. 18 C 3137, 2019 U.S. Dist. LEXIS 150629, at *11-12 (N.D. Ill. Sep. 4, 2019) ("A plaintiff can also establish that a governmental entity's lack of policy was a deliberate choice by offering evidence, … that the entity had knowledge that without the policy, the constitutional rights of individuals would 'sometimes be violated.' … [I]f a jury were to find that the Sheriff's Office had a policy of inaction … it could reasonably further

16

conclude that this policy directly caused [the plaintiff's injury].") (*citing Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017)).

## CONCLUSION

For the reasons set forth above and in Plaintiff's motion for summary judgment, Plaintiff respectfully requests that this Court deny Defendants' motion for summary judgment and grant Plaintiff's motion for summary judgment.

Respectfully submitted,

/s/Mark G. Weinberg
/s/Adele D. Nicholas
*Counsel for Plaintiff*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

17